NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

KERRY ANN HOLSTER,

                Plaintiff,                  CIVIL NO. 04-1791 (GEB)

    v.

McMASTER-CARR SUPPLY
COMPANY, et al.,                **MEMORANDUM OPINION**

                  Defendants.

**BROWN, Chief District Judge**

      This matter comes before the Court upon Defendants McMaster-Carr Supply Company, *et al.* (hereinafter "Defendants") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(e) [Docket Entry # 24] and Defendants' Motions to Strike and Sanctions [Docket Entry ##'s 70 and 73].  The action was reassigned to the undersigned on September 14, 2006, and the Court, having read and fully considered all of the parties' submissions, has decided this matter without oral argument pursuant to Fed.R.Civ.P. 78.  For the reasons discussed below, Defendants' Motion for Summary Judgment is granted and the Motions to Strike are denied.

I.      **BACKGROUND**

      Plaintiff Kerry Ann Holster (hereinafter "Plaintiff") filed a four count Complaint on April 19, 2004.  Count One alleges violations of ERISA, § 510; Count Two alleges NJLAD, N.J.S.A. 10:5-12; Count Three alleges breach of contract; Count Four alleges breach of implied covenant of good faith and fair dealing.

      Plaintiff was hired by Defendant McMaster-Carr Supply Company, Dayton branch (hereinafter "MCSC") on or about February 15, 1983.  (Compl., ¶ 10).  Plaintiff continued to

work at MCSC for the following 21 years.  During that time, Plaintiff held numerous job titles, including Sales Desk Supervisor, Switchboard Supervisor, Telecommunications Specialist, House Buyer and PC Branch Expert.  (*Id.* at ¶ 11).  During her time at MCSC, Plaintiff utilized 14 sick days and 7 days for sickness of a family member, death in the family, or "excused other." (Plaintiff 56.1 Statement, ¶ 4).  Performance reviews were regularly given and Plaintiff's reviews generally ranged from average to above average, however in 2003 her review reflected a "substandard performance."  (*Id.* at ¶ 3).

In or about January 2004, Plaintiff received a summons for jury duty for the week of February 9, 2004.  (Opposition Brief, p. 3).  Plaintiff notified Mr. Sauer of Plaintiff's pending jury service in or about January of 2004 for the week of February 9, 2004.  Plaintiff gave Mr. Sauer a copy of the jury service notification and although he glanced at the notification, he did not read it "in detail" at the time it was provided to him.  (Defendants' Motion, p. 3).

On February 6, 2004, Plaintiff received her job performance appraisal from her immediate supervisor, Mr. Shaun Sauer.  Plaintiff's review reflected performance below expectations, however, her performance was not at a level which placed her job in immediate jeopardy.[1]  (*Id.* at p. 4).  Before the end of the work day, Plaintiff informed Mr. Sauer that she would be absent the following week because she had jury duty.[2]  (*Id.*).

That weekend, Mr. Sauer discussed the next week's schedule with his wife, expressing to her that the upcoming week was going to encompass longer hours due to Plaintiff's jury duty.

---

[1] Plaintiff contends that her performance review was favorable and she did not perceive any need for improvement.  (Compl., ¶ 43).

[2] Plaintiff contends that Mr. Sauer approached Plaintiff and told her that although he knew she had jury duty the following week, he "wanted her to take the week off and relax." (Plaintiff 56.1 Statement, ¶ 6).

Mrs. Sauer informed Mr. Sauer that prospective jurors were notified day by day, via recorded messages, whether they needed to physically report for jury service.  (*Id.*).  Mrs. Sauer based this information upon her own prior jury service.  (*Id.*).

That Monday, Mr. Sauer reviewed the copy of the summons he had obtained when Plaintiff first notified him of jury duty service.  There, Mr. Sauer saw the instruction which stated: "You must report on 02/09/2004 per recorded message . . ."  That afternoon, Mr. Sauer contacted the Ocean County Jury Management Office, at which time he was told that a recorded message posted on Friday, February 6, 2004, at 6:00 p.m. instructed prospective jurors not to report to jury duty on Monday, February 9, 2004, but to call back that evening at 6:00 p.m. for instructions regarding potential jury service on Tuesday, February 10, 2004.  (*Id.* at p. 5).  On Tuesday morning, after Plaintiff failed to report to work again, Mr. Sauer called the Ocean County Jury Management Office and learned that potential jurors were instructed on Monday evening not to report on Tuesday morning unless they lived more than an hour and a half from the courthouse, and to check the recorded message at noon to see if they were needed Tuesday afternoon.  (*Id.*).

At that time, Mr. Sauer spoke with Mr. Finn, who instructed Mr. Sauer to obtain additional information regarding Plaintiff's potential jury service.  Thereafter, in the afternoon hours of Tuesday, February 10, 2004, Mr. Sauer again contacted the Ocean County Jury Management Office.  At their request, Mr. Sauer faxed an inquiry on company letterhead.  He called the courthouse to confirm receipt of the fax and was told that potential jurors were informed by recorded message posted Tuesday at noon that they were not to report on Tuesday afternoon, and that jury service was concluded for the remainder of the week.  (*Id.*).

When Plaintiff failed to report to work on Wednesday, February 11, 2004, Mr. Sauer again approached Mr. Finn.  Mr. Finn instructed Mr. Sauer to draft notes of his discussions with the court and to obtain written verification regarding Plaintiff's jury service.  Thereafter, Jury Service Manager Patty Scillieri faxed Mr. Sauer two letters which confirmed the information regarding jury service for Monday and Tuesday and which also confirmed that Plaintiff's jury service was concluded as of Tuesday, February 10, 2004, at 6:00 p.m.  (*Id.* at pp. 5-6).

Mr. Finn informed Mike Bostancic, the Branch Manager of the Dayton, New Jersey branch of MCSC, of the situation regarding Plaintiff.  Mr. Bostancic then instructed Mr. Finn to wait until Plaintiff returned to work and then to ask her for an explanation before taking any further action.[3]  (*Id.* at p. 6).

Plaintiff did not call in or report to work the week of February 9, 2004.  Plaintiff did report to work at 7:00 a.m. on Monday, February 16, 2004.  Mr. Sauer asked Plaintiff how jury duty went, and Plaintiff replied that jury duty was "a pain" or "ridiculous."  Plaintiff then instructed Mr. Sauer not to count Thursday, February 12, 2004, as a jury duty day because it was

_____

[3]  Plaintiff alleges that on Monday morning, February 9, 2004, she went to the courthouse to serve as a juror.  She later discovered that she was not supposed to come in, but merely call in that morning to see if her number had been selected to come in.  She left mid-morning.  (Plaintiff 56.1 Statement, ¶ 7).  Plaintiff further alleges that she called the courthouse on Tuesday morning, February 10, 2004, discovered that she was not needed for the morning session, but that she was required to call back at noon for the afternoon session.  When she called at noon, Plaintiff was told that she was not needed for the afternoon session.  (*Id.* at ¶ 8).  On Wednesday morning, February 11, 2004, Plaintiff allegedly called the courthouse and determined that she was not needed for jury duty for the remainder of the week.  (*Id.* at ¶ 9).  Plaintiff spent the entire week at her Ocean County, New Jersey home, conducting home improvement projects.  (Opposition Brief, p. 5).

a court holiday.  (*Id.*).[4]

Mr. Sauer then informed Mr. Finn of the dialogue Mr. Sauer had with Plaintiff.  Mr. Finn in turn then went to speak with Mr. Bostancic, who instructed Mr. Finn to meet with Plaintiff to give her an opportunity to explain herself.  Mr. Bostancic instructed Mr. Finn to terminate Plaintiff if she failed to offer an explanation that "made sense." (*Id.* at pp. 6-7).

At 9:00 a.m. on Monday, February 16, 2004, Plaintiff was called into a meeting with Mr. Finn and Mr. Sauer.  Plaintiff was informed at that time that the courthouse had been contacted, and that they had evidence to show that Plaintiff was not at jury duty.  Plaintiff responded that by the time she learned she was not required to serve on Monday or Tuesday, it was too long a drive to make it to work.  She refused to answer any additional questions, stating that she made the decision there was no time to make the drive and she was not going to debate it.  Plaintiff offered no explanation as to her absence on that Wednesday, Thursday and Friday.  At that point, Mr. Finn stated to Plaintiff that she did not report to work at any time the entire week when she should have done so.  Mr. Finn then gave Plaintiff one last chance to explain, to which Plaintiff responded "[D]o what you have to do."  Mr. Finn then informed Plaintiff that her employment with MCSC was terminated.[5]  (*Id.*).  At the time of her termination, Plaintiff was 42 years old,

---

[4]  Plaintiff alleges that Mr. Sauer approached Plaintiff and inquired as to how jury duty was.  Plaintiff asserts that she responded to Mr. Sauer by stating that "it was ridiculous because she kept having to call in."  Plaintiff further stated to Mr. Sauer that the previous Thursday should have been lodged as a vacation day as it was a court holiday. (Opposition Brief, p. 5).

[5]  Plaintiff alleges that at approximately 9:00 a.m., she was asked to meet with Mr. Sauer and his manager, Mr. Steve Finn.  Mr. Finn inquired of Plaintiff how jury duty was and she responded "as she had to Mr. Sauer." (*Id.*).  Mr. Finn then allegedly proceeded to inform Plaintiff that he had information that she was not needed for jury duty on Monday or Tuesday of the previous week.  Plaintiff allegedly informed Mr. Finn that she had not realized that she was not needed for jury duty on that prior Monday until mid-morning, and that although she was not needed for jury duty on that previous Tuesday, she was required to call in to the courthouse in the

had been working at MCSC for 21 years, and had accrued over $500,000 in retirement benefits

through MCSC's profit-sharing trust fund.  (Opposition Brief, p. 2).

Plaintiff's position was filled on March 23, 2004.  The individual hired for Plaintiff's

position was 33 years old at the time he was hired.  (Defendants' Motion, pp. 7-8).  Plaintiff's co-

worker at the time of her termination was 50 year-old Arnold Barnes.  Mr. Barnes continues to be

employed at MCSC, and Mr. Sauer continues to be his supervisor.  Mr. Sauer was 37 years old at

the time of Plaintiff's termination.  Mr. Finn was 43 years old at the time of Plaintiff's

termination.  Mr. Bostancic was 48 years old at the time of Plaintiff's termination.[6]

_____

morning and the afternoon.  Mr. Finn then asked Plaintiff why she did not come into work after
realizing that she was not needed for jury duty.  Plaintiff alleges that at that time, she did not
wish to get Mr. Sauer into trouble for giving her the week off, so she stated to Mr. Finn that she
did not feel she had adequate time to drive to work and get back to court had she been
summonsed for the afternoon session.  Mr. Finn thereafter became angry, Plaintiff asserts.
Plaintiff "told him she made the decision, she did not want to argue about it with him, and he
should do what he had to do."  At that time, Mr. Finn notified Plaintiff that she was terminated
from her employment at MCSC.  (Opposition Brief, p. 6).

[6] Plaintiff asserts that the real reason she was terminated from her employment was
because of discrimination based upon her age, and not because of jury duty, as previous
employees have failed to come to work when scheduled without calling, but were not terminated
without warning.  (Id. at p. 7; Plaintiff 56.1 Statement, ¶ 30a-c).  Plaintiff asserts that as far back
as the year 2001, she "began to notice that older, long-term employees were being terminated."
Plaintiff further asserts that the reasons MCSC terminates older, long-term employees is to
prevent them from vesting in retiree health benefits and to replace them with new hires to whom
they could pay a lower salary "so that they could increase their contribution to the remaining
employees' profit sharing accounts without a corresponding increased cost to [MCSC]."
(Opposition Brief, pp. 27-28).

Plaintiff offers, as evidence of age discrimination, anecdotal evidence of younger, short-
term employees who were not terminated despite engaging in misconduct, and other older, long-
term employees who were suddenly terminated for alleged poor performance or misconduct after
years of acceptable performance.  Further evidence is presented in the form of statistical tables
providing as follows: (1) during the years 2000 through 2004, MCSC's Dayton branch hired
more than three times as many workers under 40 as it terminated; (2) in the year 2000, MCSC's
Dayton branch hired 4 times as many employees 40 and over as it fired; (3) in the years 2001
through 2003, MCSC's Dayton branch hired less than half as many employees 40 and over as it

After Plaintiff's termination, she applied for unemployment benefits. The initial certified statement provided by Plaintiff to the Claims Examiner stated that she needed to call into court twice a day the week of February 9, 2004 to find our if her appearance was required at jury duty. (Defendants' Statement of Facts, ¶¶ 177-180). In a rebuttal statement thereafter sent to the Claims Examiner, Plaintiff stated that she had been given the week off by Mr. Sauer. On March 25, 2004, the Director of the Division of Unemployment Insurance denied her claim for benefits, finding in part that Plaintiff had demonstrated a "willful and deliberate disregard of the standards of behavior [the] employer had a right to expect." (*Id.* at ¶¶ 181-182).

Plaintiff thereafter appealed the denial of benefits to the Appeal Tribunal, which held a hearing on or about May 20, 2004. Plaintiff was represented by counsel. On May 24, 2004, the Appeal Tribunal upheld the denial of benefits. The Appeal Tribunal found that Plaintiff had engaged in "gross misconduct" by committing the crime of "theft by deception." (*Id.* at ¶¶ 185-186).

---

fired; (4) the terminations of employees 40 and older at MCSC's Dayton branch, in relation to the total number of older employees, increased 800% between 2000 and 2001; (5) employees 40 and older made up 40% of the labor force at the Dayton MCSC branch in 2000, increased to 46% in 2001, but grew to "only" 50% by 2004; (6) in 2000, 16% of terminated employees were "older" employees, however, in 2001 43% of terminated employees were "older" employees; and (7) in the years 2002 through 2004, "older" workers were terminated in numbers more than their proportion to the overall labor force; (8) in utilization of a statistical analysis called the "t-test", the average age of terminated employees after the year 2000 grew exponentially; and (9) 77% to 99% of MCSC's new hires were under 40 years of age in or about 2004. (Plaintiff's 56.1 Statement, ¶¶ 39-47).

Plaintiff additionally offers a letter by a proposed expert, Dr. Barbara McIntosh. The letter discusses the prevalence of and motivation for age discrimination in the workplace, including negative stereotypes and the "costs" of an aging workforce upon a company because of retirement benefits.

Plaintiff thereafter appealed the Appeal Tribunal's decision.  The Board of Review affirmed the Appeal Tribunal's denial of benefits in a decision dated September 10, 2004.  (*Id.* at ¶ 186).

On or about October 20, 2004, Plaintiff filed an appeal with the New Jersey Superior Court appealing the Board of Review decision.  On February 3, 2005, the New Jersey Superior Court affirmed the Board of Review's decision and upheld the denial of unemployment benefits. The court specifically held that "[W]e are satisfied, therefore, that the evidence supports a finding of gross misconduct because [Plaintiff's] conduct constituted the required elements for the offense of attempted theft by deception pursuant to N.J.S.A. 2C:5-1a and N.J.S.A. 2C:20-4 . . . [T]hese acts constituted an attempt by [Plaintiff] to mislead [Defendant] McMaster-Carr into believing that she had in fact performed jury duty the week before, with the exception of Thursday."  (*Id.* at ¶¶ 187-188).

## II.    STANDARD OF REVIEW

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir. 1996); *Healy v. New York Like Ins. Co.*, 860 F.2d 1209, 1219, n.3 (3d Cir. 1988), *cert. denied*, 490 U.S. 1098 (1989); *Hersh v. Allen Prod. Co.*, 789 F.2d 230, 232 (3d Cir. 1986).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to

return a verdict in its favor).  In deciding whether triable issues of fact exist, the Court must view

the underlying facts and draw all reasonable inferences in favor of the non-moving party.  *See*

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pennsylvania*

*Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

> Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

> > When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).  The rule does not increase or decrease a party's ultimate burden of proof

on a claim.  Rather, "the determination of whether a given factual dispute requires submission to

a jury must be guided by the substantive evidentiary standards that apply to the case."  *Anderson*,

477 U.S. at 255-56.

> Under the rule, a movant must be awarded summary judgment on all properly supported

issues identified in its motion, except those for which the non-moving party has provided

evidence to show that a question of material fact remains.  *See Celotex*, 477 U.S. at 324.  Put

another way, once the moving party has properly supported its showing of no triable issue of fact

and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be

"supplemented . . . by depositions, answers to interrogatories, or further affidavits," id., "its

opponent must do more than simply show that there is some metaphysical doubt as to the

material facts."  *Matsushita*, 475 U.S. at 586, n.12; *see also Anderson*, 477 U.S. at 247-48 ("[B]y

its very terms, this standard provides that the mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion . . . the requirement is

that there be no *genuine* issue of *material* fact.") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324; *see also Lujan v. National Wildlife Fed.*, 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit."); *Anderson*, 477 U.S. at 249; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant" but rather must exceed the 'mere scintilla' threshold.), *cert. denied*, 507 U.S. 912 (1993).

## III.    DISCUSSION

### A.    Preclusion

Defendants assert that this Court should give preclusive effect to the state court determinations regarding Plaintiff's unemployment benefits eligibility.  Generally, federal courts must give "the same preclusive effect as would be given that judgment under the law of the State in which the judgment was entered."  *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75 (1984).  New Jersey courts follow the preclusion principles found in the *Restatement (Second) of Judgments* (1982).  Under the *Restatement*, "A valid and final personal judgment rendered in favor of the defendant bars another action by the plaintiff on the same claim."  *Culver v. Insurance Co. of N. Am.*, 115 N.J. 451, 460 (1989) ("Where the second action is no more than a repetition of the first, the first lawsuit stands as a barrier to the second.").

-10-

When considering whether preclusion principles apply, a court must contemplate both claim preclusion (or re judicata) and issue preclusion (collateral estoppel).  For a defendant to prevail on grounds of claim preclusion, there must be an earlier valid and final judgment in an action involving "substantially similar or identical causes of action and issues, parties, and relief sought."  *Id.*  In determining whether the causes of action are substantially similar, a court is to consider: (1) whether the acts complained of and the demand for relief are the same (that is, whether the wrong for which redress is sought is the same in both actions; (2) whether the theory of recovery is the same; (3) whether the witness and documents necessary at trial are the same (that is, whether the same evidence necessary to maintain the second action would have been sufficient to support the first); and (4) whether the material facts alleged are the same.  *Id.* at 461-62.

Here, the causes of action are dissimilar.  Plaintiff previously sought unemployment benefits, while the instant action seeks damages for loss of retirement benefits, redress for perceived age discrimination, and breach of contract/breach of good faith and fair dealings violations.  These claims are dissimilar, consist of different elements, and require different evidence.  As such, claim preclusion is not applicable.

We now turn to issue preclusion, or collateral estoppel.  *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1070-74 (3d Cir. 1990) (claim preclusion did not bar plaintiff's claims, but issue preclusion did).  The focus of issue preclusion is efficiency.  *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328-329 (1971).  Its purpose is to prevent the relitigation of issues previously resolved, thereby promoting judicial economy.  Under New Jersey law, the doctrine of issue preclusion requires a "discretionary weighing of economy

-11-

against fairness." *Kortenhaus v. Eli Lilly & Co.*, 228 N.J.Super. 162, 265, A.2d 437 (App.Div. 1988).

Among the criteria to be considered before issue preclusion can be invoked are whether: (1) the party to be estopped was a party or in privity with a party in the prior action; (2) the issue to be estopped is the same as that previously litigated; and (3) the issue was actually litigated (or finally resolved) and necessary to the prior judgment. *Glictronix Corp. v. American Tel. & Tel. Co.*, 603 F.Supp. 552, 565 (D.N.J. 1984). After addressing these factors, a determination must be made as to whether preclusion would be fair. Inquiries as to fairness include whether the party to be estopped had incentive to vigorously litigate the first action; whether there was more than one judgment involved and their consistency; whether the second action affords some procedural opportunities unavailable in the first action; and whether application of issue preclusion would otherwise be unfair to the defendant. *Id.*

In consideration of the first prong, this Court notes that New Jersey has essentially abandoned the requirement of privity and adopted the modern rule of issue preclusion as set forth in the *Restatement*, which states that "[a] party precluded from relitigating an issue with an opposing party . . . is also precluded from doing so with another person unless the fact that he lacked full and fair opportunity to litigate the issue in the first action or other circumstances justify affording him an opportunity to relitigate the issue." *Id.* at § 29. As Plaintiff was the moving party in both the prior unemployment rulings and the instant action, and as at least some of the Defendants in the case at bar were Defendants in the prior litigation, the first prong has been satisfied.

-12-

The next prong set forth for this Court's consideration is the identity of the issues. *Restatement* § 27 provides that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Therefore, as is the case here, the claims set forth in the prior and present litigation need not be identical, but rather, the underlying issue of fact.

Plaintiff asserted in her unemployment benefits litigation that she was given the week off by Mr. Sauer and that she was not terminated for gross misconduct. This assertion was made on appeal to the state Appeals Tribunal, and was rejected. The same assertion was then made on appeal to the state Board of Review, which affirmed the Appeals Tribunal's determination. Finally, the same assertion was made on appeal to the New Jersey Superior Court, which affirmed the Board of Review's determination. Therefore, the issues of fact whether Plaintiff was given the week off by her superior or was terminated for gross misconduct were clearly identified and considered by the state administrative and judicial bodies.

The final prong is the determination as to whether the issues were actually litigated or resolved and were necessary to the prior determination. Whether a judgment will be considered final for purposes of issue preclusion turns on "such factors as the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review." *Glictronix* at 573. The Supreme Court has held that state court review of an administrative determination may be given preclusive effect in subsequent federal actions. *See Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 479-85 (1982); *see also University of Tennessee v. Elliott*, 478 U.S. 788, 769-99 (1986) (suggesting that even unreviewed administrative

determinations may have preclusive effect in subsequent § 1983 actions).  In New Jersey, judicial

review, even if limited, of a nonjudicial body's action also is given preclusive effect.  *Zoneraich

v. Overlook Hospital*, 212 N.J.Super. 83, 90-92, 514 A.2d 53, 56-58 (App.Div.); *Chugh v.

Western Inventory Services, Inc.*, 333 F. Supp. 2d 258, 293 (D.N.J. 2004).

 Here, not only were the issues in question thoroughly considered in the administrative

channels, but the New Jersey Superior Court also considered the issue on appeal.  As such, the

issues whether Plaintiff was given the week off and whether or not she was terminated for gross

misconduct were actually litigated.  Furthermore, it was necessary for the state administrative and

judicial bodies to determine the issues in order to issue a ruling.  Indeed, it was the determination

that Plaintiff had not been given the week off and had been terminated for gross misconduct that

prevented the issuance of unemployment benefits, and remained the sole factors to resolve

throughout that legal process.  Therefore, the unemployment hearings and rulings, both

administrative and judicial, satisfy all three prongs of the issue preclusion analysis.

 The Court is next required to determine whether issue preclusion would be fair to

Plaintiff.  In consideration of the aforementioned factors when contemplating the fairness of

preclusion, the Court first finds that Plaintiff thoroughly and vigorously litigated the first action.

Specifically, Plaintiff obtained counsel early on in the unemployment benefit process.

Additionally, Plaintiff took full advantage of all avenues available to her regarding the litigation

and appeal of her unemployment benefits.  Clearly, Plaintiff had a keen interest in obtaining

unemployment benefits.  Further, the Court finds that the administrative rulings and the judgment

from the New Jersey Superior Court were all consistent in their findings.

Additionally, while procedural variations generally can exist between federal and state tribunals, and specifically do exist when one contrasts legal efforts to obtain unemployment benefits in the state and the instigation of a federal civil litigation, the Court nevertheless finds that those procedural variations are not such as to cause this Court to believe that any determination on the issue in question would substantially alter.  In that regard, Plaintiff provides no witnesses that are able to corroborate her assertion that she was given the week off.  She provides no clear precedent that the company arbitrarily gave weeks off to disgruntled employees to cheer them up.  Mr. Sauer had no authority to give Plaintiff the week off, a fact which he was aware of.  Her explanation as to why she informed Mr. Sauer to mark Thursday a vacation day because it was a court holiday is unpersuasive.  Her failure to assert that she was given the week off when confronted by Mr. Finn, her superior's superior, because she didn't want to get Mr. Sauer in trouble is equally unpersuasive.  No person would doubt that their status as an employee was in serious jeopardy when said person is brought into a meeting at 9:00 a.m. in the beginning of a work week, confronted by two members of management, and asked to explain a significant period of absence.  Plaintiff's answer that she did not want to debate the issue simply suggests that she was unable to come up with a plausible excuse as to her absence when informed that management had confirmed that Plaintiff did not actually serve on jury duty that entire week, and did not even need to call in after, at latest, Wednesday morning of that week.  All of this fully supports the New Jersey administrative and Superior Court determinations, and severely diminishes any prospect that a procedural variation in federal court would vary said determinations.

Plaintiff has had a full evaluation of the circumstances surrounding her absence and her explanations, in which Plaintiff was entitled to provide evidence, and during which Plaintiff was represented by counsel.  Further, that evaluation, and those opportunities, have occurred several times in the state system.  As such, a finding of issue preclusion would not be unfair to Plaintiff here in federal court.  This Court therefore finds that Plaintiff is collaterally estopped from raising the issue of whether or not she was given the week of February 9, 2004, off by her supervisor and whether she was terminated for gross misconduct.  For purposes of Defendants' summary judgment motion, the Court will assume that Plaintiff was not provided the week of February 9, 2004, off from work, but rather, took the week off for jury duty, for which she was never needed.

**B.     NJLAD Claims**

Defendants argue that Plaintiff has failed to establish a *prima facie* case for age discrimination, and that even if she did, she fails to defeat Defendants' showing that she was terminated for a legitimate, non-discriminatory reason.  The Court agrees.

Specifically, the NJLAD provides that it is unlawful "[f]or an employer, because of the . . . age . . . of any individual . . . to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . ."  N.J.S.A. § 10:5-12(a).

When considering claims of employment discrimination under the NJLAD based on circumstantial evidence, the Court must employ the *McDonnell Douglas-Burdine* burden shifting framework at the summary judgment stage.  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450

U.S. 248 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Peper v. Princeton Univ. Bd. of Trustees*, 77 N.J. 55, 82-83, 389 A.2d 465 (1978) (applying *McDonnell Douglas-Burdine* framework to NJLAD claims).

The *McDonnell Douglas-Burdine* analysis consists of three steps.  First, Plaintiff must establish a *prima facie* case by a preponderance of the evidence.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).  "The evidentiary burden at [the *prima facie* case] stage is rather modest: it is to demonstrate to the court that the plaintiff's factual scenario is compatible with discriminatory intent - i.e., that discrimination could be a reason for the employer's action." *Marzano v. Computer Sci. Corp. Inc.,* 91 F.3d 497, 508 (3d Cir. 1996).

Plaintiff's initial burden of establishing a *prima facie* case of age discrimination is satisfied by presenting evidence: (1) that Plaintiff is a member of a protected class; (2) that Plaintiff was discharged; (3) that Plaintiff was meeting the employer's legitimate expectations; and (4) that Plaintiff was replaced by persons sufficiently younger to create the inference of age discrimination.  *Warner v. Federal Express Corp.*, 174 F. Supp. 2d 215, 219 (D.N.J. 2001).

Here, Plaintiff fails to satisfy the third prong of her initial burden.  Although she is a member of a protected class, she was discharged, and she was replaced by a younger person (although it is questionable whether the age of the replacement was "sufficiently" younger, as that term is defined), Plaintiff nevertheless fails to show that she was meeting the employer's legitimate expectations at the time of her termination.  There can be no doubt that an employer has the right to expect honesty from their employees, and that an employee will come to work when expected.  Defendant MCSC provides certain periods of annual leave for employees, and those employees are free to utilize said leave when necessary.  To simply leave work for a week

under a false pretense, as Plaintiff has done here, is not appropriate, and would cause not only Defendant MCSC to terminate Plaintiff's employment, but many other employers as well.

The Court therefore finds that Plaintiff failed to meet Defendant MCSC's legitimate expectations at the time of her termination, and as such, fails to meet her *prima facie* case of age discrimination.

Assuming *arguendo* that Plaintiff had successfully made a *prima facie* showing, her NJLAD age discrimination claim would nevertheless fail as Defendants demonstrate a legitimate reason for Plaintiff's termination. Specifically, when a plaintiff meets her initial showing, a presumption of discriminatory intent on the part of the defendant is created. *Burdine* at 254. The defendant must then produce evidence showing that it made the adverse employment decision "for a legitimate, nondiscriminatory reason." *Id.* "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection" which would support a jury finding that unlawful discrimination was not the cause of the adverse employment action. *Hicks* at 507. If the defendant comes forth with a legitimate reason for the employment action, the presumption of discrimination drops from the case, *Burdine* at 260, and the burden shifts to the plaintiff to prove by a preponderance of the evidence that the stated reason was pretextual. *Hicks* at 508. As the Third Circuit explained in *Fuentes v. Perskie*:

> [T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the . . . plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employers's proffered legitimate reasons for its action that a reasonable factfinder could rationally find then 'unworthy of credence,' and hence infer 'that the employer' did not act for [the asserted] nondiscriminatory reasons.

32 F.3d 759, 765 (3d Cir. 1994); *Rogers v. Alternative Resources Corp.*, 440 F. Supp. 2d 366

(D.N.J. 2006).

_____  In the instant matter, the basis for termination has been clearly recognized.  Defendant

did not report to work the week of February 9, 2004, on the premise of jury duty.  However,

Plaintiff did not actually have jury duty that week.  The deception was such as to prompt

management to terminate her, and that termination was based on a legitimate, nondiscriminatory

reason.  As the burden now shifts back to Plaintiff to show that Defendants legitimate,

nondiscriminatory reason is pretextual, Plaintiff offers personnel information of other, younger

employees of Defendant MCSC who had stolen time or otherwise engaged in poor behavior, but

yet were not terminated.  Some examples Plaintiff provides includes coworkers in their 30's who:

took sick days on either Fridays or Mondays to extend weekends; failed to contact management

when taking days off; deceived management to allow for absences where no further vacation

time was available; stole from the company; engaged in sexual conduct during work hours; and

wasted time during work hours.  Plaintiff further offers information regarding coworkers who

were terminated after long periods of service (14 years or more) and who had positive

performance reviews until approximately 2001 or 2002, when each received poor performance

reviews and who were thereafter terminated, as well as statistical evidence of Defendant MCSC

engaging in a pattern of discrimination on the basis of age (set forth above), as calculated by Dr.

Elias C. Grivoyannis, and an opinion from Dr. McIntosh (set forth above), stating that the data

supported a finding of age discrimination.[7]

---

[7]  The Court notes Defendants' motions to strike Dr.'s Grivoyannis and McIntosh's expert
reports.  However, the Court finds that the experts are qualified in their fields for purposes of the
instant motion for summary judgment, and that sanctions are not appropriate.

The Court finds, however, that the statistical data and examples of other employees does not support a finding of pretext, as Plaintiff fails to demonstrate a circumstance in which an employee was absent an entire week without plausible explanation.  An employee who takes a day here or there for potentially unsupportable reasons (although Plaintiff is not able to so assert), who is found to be "goofing off" during work hours, and who damages or removes company property does not rise to a level that Plaintiff achieved in failing to report to work 5 days in a row and then dismisses management when confronted.  The situation that most closely reflects Plaintiff's set of circumstances is a situation in which an employee failed to come to work, or to call into management to inform them that he intended to be absent.  However, those incidents were not close in time, and the Court notes that he was ultimately fired for his failure to call into work.  Further, there is no evidence to suggest that the employee in question was discovered to have attempted to intentionally deceive the company as to why he was absent.

Additionally, even if the issue as to whether Plaintiff was given the week off by Mr. Sauer was not precluded, Plaintiff still fails to satisfy her burden of proof.  Plaintiff failed to inform Mr. Finn that Mr. Sauer had allegedly given her the week off.  At that time, Mr. Finn knew only that she was supposed to be in jury duty, that she did not have jury duty that week, that any connection with jury duty ended at latest Wednesday morning of that week, that she did not call in to explain her absence, and that she did not wish to explain her absence when confronted. *Jackson v. Compbell Soup*, 2002 WL 32311458 at *8 (D.N.J. 2002) (holding that a court need not determine whether the decisionmaker was correct in his assessment of plaintiff's insubordination, only that his evaluation was non-discriminatory).

As such, the Court finds that even if Plaintiff had met her *prima facie* case of age discrimination, she fails to demonstrate by a preponderance of the evidence that the stated reason for her termination was pretextual.  Therefore, Count Two of Plaintiff's Complaint is dismissed.

### C.   **ERISA Claims**

Plaintiff asserts that Defendants terminated her as part of a pattern and practice of terminating long-term employees for two reasons, both of which violate ERISA.  Plaintiff first argues that Defendants terminated her to prevent her from vesting in retiree health benefits.  Plaintiff also argues that Defendants terminated long-term employees, including her, and replaced them with new hires to whom they could pay a lower salary so that they could increase their contribution to the remaining employees' profit sharing accounts without a corresponding increased cost to Defendant MCSC.

Much like a claim for age discrimination, Plaintiff is first charged with establishing a *prima facie* case for ERISA violations.  In order to establish a *prima facie* case, Plaintiff must demonstrate that Defendants engaged in: (1) specific employment actions; (2) for the purpose of interfering; (3) with the attainment of any right to which the employee may become entitled.  *Eichorn v. AT&T Corp.*, 248 F.3d 131 (3d Cir. 2001); *DeWitt v. Penn-Del Directory Corp.*, 106 F.3d 514, 522 (3d Cir. 1997).  If Plaintiff successfully sets forth a *prima facie* case, the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for its conduct.  If Defendants successfully set for such a reason, then the burden shifts back to Plaintiff to prove that the reason Defendants set forth is pretextual.  Plaintiff need not prove that the only reason for termination was to interfere with benefits.  However, Plaintiff must show a specific intent to interfere with such rights.  *Eichorn* at 149-50.

i.     **Retirement Profit-Sharing Benefits**

Here, Plaintiff once again fails to meet her *prima facie* obligations, as she does not demonstrate that Defendant MCSC's action of terminating Plaintiff and other long-term employees were done for the purpose of interfering with said employees' benefits.  Plaintiff asserts that she meets her obligation by showing that she was dismissed under "suspicious circumstances."  However, as discussed at length above, Plaintiff does not demonstrate "suspicious" circumstances.  Plaintiff was expected to work.  Plaintiff did not come to work for a week.  Plaintiff claimed that she had jury duty.  Plaintiff needed only to telephone the courthouse for two days.  Moreover, Plaintiff refused to explain why she failed to appear to work on Wednesday, Thursday or Friday.  Plaintiff was terminated.  Offering other terminations of individuals who Plaintiff terms "long-term" is simply insufficient to meet even this lax burden.

Furthermore, Defendants set forth further compelling evidence to refute Plaintiff's assertions.  Specifically, when Plaintiff was terminated, she had already become vested in the profit-sharing plan.  Further, she maintained an option, as all terminated employees do, to keep her account balance in the retirement plan, and to continue to do so until she reached the age of 65.  However, although Plaintiff did keep her balance in the plan initially, she withdrew the balance after 15 months.  Nevertheless, she gained an additional $45,373.50 during those months.  Therefore, the only ability lost by Plaintiff's termination regarding the retirement benefits was her ability to participate in future contributions.  Plaintiff was still permitted to obtain monies from Defendants for previous contributions.

Additionally, Defendants have demonstrated that Defendant MCSC has consistently increased its contributions to the retirement plan over the years.  Specifically, in 2002, MCSC contributed approximately $36 million.  In 2003, MCSC contributed approximately $39 million,

and approximately $48 million in 2004, the year Plaintiff was terminated.  These contributions by MCSC were discretionary.

Defendants further show that a termination of a long-term employee would not benefit or increase "remaining employees' profit sharing accounts without a corresponding increased cost to Defendant MCSC" as Plaintiff asserts, because employee contributions are determined in accordance with salary.

### ii.     Retirement Health Insurance Benefits

Plaintiff likewise fails to satisfy her *prima facie* requirements regarding her assertion that she was prematurely terminated to save costs on retiree health insurance payments.  Specifically, Defendants demonstrate that Plaintiff would have had to work at MCSC for another 14 years to meet minimum eligibility requirements.  The remaining amount of time for Plaintiff to become eligible to receive retiree health insurance was simply too vast to cause Defendants to terminate Plaintiff on this basis.

Plaintiff therefore fails to establish a *prima facie* case under ERISA and Count One shall be dismissed.[8]

### D.     Breach of Contract and Implied Covenants of Good Faith and Fair Dealing

Counts Three and Four of Plaintiff's Complaint allege breaches of contract and implied covenants of good faith and fair dealing.  However, as the profit-sharing and health benefit plans are ERISA plans, Plaintiff's state law claims are preempted in favor of ERISA.  *Pane v. RCA Corp.*, 868 F.2d 31, 635 (3d Cir. 1989).  Counts Three and Four of Plaintiff's Complaint are

---

[8]  The Court further finds that even if Plaintiff had established a *prima facie* case for violations of ERISA, Defendants have successfully demonstrated a legitimate, nondiscriminatory reason for Plaintiff's termination, and that the reason proffered is not pretextual.

therefore dismissed.[9]

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted.

Defendants' Motions to Strike are denied.

s/Garrett E. Brown, Jr.
**HONORABLE GARRETT E. BROWN, JR**
**CHIEF UNITED STATES DISTRICT JUDGE**

Dated: October 3, 2006

---

[9]  The Court notes Defendants' observations regarding the form of Plaintiff's opposition to Defendants' summary judgment motion.  Indeed, had Plaintiff's counsel complied with L.Civ.R. 7.2(d), the submitted opposition brief would have far exceeded the proscribed page limit.  Further, law shall not be asserted in affidavits pursuant to L.Civ.R. 7.2(a).  Although no request for an extension of the page limit was received by the Court, all portions of Plaintiff's brief were considered.  However, those portions of Plaintiff's submitted affidavits where law was asserted were not contemplated by the Court.  Plaintiff's counsel is forewarned that future submissions must comply with both the Federal and Local Rules of Civil Procedure, or said submissions will be precluded from consideration.